# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| LUTHER S. PATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:16-cv-01171-LSC |
| | ) | |
| MARK TOTO, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

### MEMORANDUM OF OPINION

Before the Court is Plaintiff's, Luther S. Pate ("Pate"), Motion for Default

Judgment (doc. 46); Defendants', Mark Toto ("Toto") and Moboco Fine Jewelry &

Gems ("Moboco") (collectively "Defendants"), Second Motion for Summary

Judgment (docs. 55 & 67)[1]; and Defendants' Motion to Strike (doc. 61). These

motions have been fully briefed and are ripe for decision. For the following

reasons, Pate's Motion for Default Judgment is due to be denied; Defendants'

Second Motion for Summary Judgment is due to be granted in part and denied in

part; and Defendants' Motion to Strike is due to be denied.

---

[1] Originally, Defendants filed for summary judgment on February 28, 2018. (*See* Doc. 32.) On
March 22, 2018, to allow for additional discovery, the Court mooted that motion. (Doc. 39.)

# I.     BACKGROUND[2]

Defendant Toto, a businessman from California, owns Moboco Fine Jewelry & Gems, which sells jewelry and fine watches. He has many years of experience appraising diamonds and learned how to evaluate gemstones by taking courses through the Gemological Institute of America. Toto became acquainted with Pate, an Alabama real estate developer and investor, sometime in the mid-1990s. Soon thereafter, Pate became Toto's customer. Around June 2006, Toto began discussions to determine if Pate would be interested in acquiring a red diamond. On June 8, 2006, Toto emailed Pate that he would sell the red diamond for $2,100,000. Central to the parties' dispute is whether this represented a fair price. Although there is no dispute that Toto originally paid $800,000 to obtain the diamond, there is some dispute as to what profit Toto actually made from the deal.

Throughout the summer of 2006, Pate and Toto continued to negotiate Pate's purchase of the red diamond. On September 6, 2006, Toto brought the diamond to Alabama for Pate to inspect. Pate's breach of contract claim is based on Toto's alleged statement at this meeting that the red diamond was worth at least

---

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotes omitted).

$2,100,000 and that Toto would help Pate sell the diamond in three to five years for at least twice that amount. Pate asserts that Toto also told him that he would only be making a $100,000 profit on Pate's purchase of the diamond. Pate then agreed to purchase the red diamond from Toto, but the terms of this agreement were not put into writing.

In early October 2006, Pate paid Toto for the red diamond. On November 14, 2006, Toto sent Pate an appraisal which stated that the diamond had been appraised for $2,100,000. Although the appraisal's fine print noted that the appraisal reflected "the costs incurred to replace or reproduce any gems in like quality" (doc. 55-9 at 24), there is a dispute as to whether Toto represented that the appraisal's "estimate of value" reflected the diamond's actual value. The fine print also provided that the appraisal should not be considered a guarantee or warranty as to the value of the red diamond. Pate states that due to poor eyesight he could not read the portion of the appraisal noting that the red diamond was being appraised at replacement costs or the portion disclaiming any guarantee as to the actual value of the diamond. Following Pate's purchase of the red diamond, he and Toto began discussing Toto finding a buyer for the diamond. In the spring of 2008, Pate agreed to sponsor Toto's trip to Russia where he would market the red diamond at the Moscow Art Faire ("Moscow Fair"). Pate and Toto agreed that Toto could sell the red diamond to buyers at the Moscow Fair for $3,500,000.

Ultimately, Toto did not sell the red diamond on his trip to Russia and returned the diamond to Pate in June 2008.

On several other occasions between Pate's acquisition of the diamond and 2011, Toto and Pate discussed Toto marketing the red diamond. In 2009, Toto convinced Pate to have the diamond mentioned in the book *Famous Diamonds* by Ian Balfour. The book currently lists the diamond's value at $6 million. Toto also referred Pate to potential buyers and asked Pate to allow him to market the diamond at a California jewelry presentation in May 2010.

In January 2011, Pate learned from a story on the Internet that in 2005 a red diamond had been offered for sale in Hong Kong for $700,000. Pate emailed Toto asking him what he knew about the story and expressed his belief that it provided interesting history on his red diamond. Toto replied that he had never heard that story. In response, Pate stated that it was "[n]ot a story . . . a fact!"

The parties dispute whether Toto and Pate had any additional conversations regarding the Hong Kong auction prior to August 2011. In early August 2011, Pate discussed the Hong Kong auction with Quin Bruning ("Bruning"), a diamond expert at Sotheby's auction house in New York. During that conversation, Bruning expressed his belief that the two diamonds were the same. On August 3, 2011, Pate called Toto and asked him questions about the profit Toto made on the diamond and its value. During that conversation, Toto stated that he thought his profit was

around $155,000, which he now states was his profit after factoring in overhead expenses. Toto further stated that although he did not know whether the red diamond was the same as the one sold in Hong Kong that Pate's diamond "definitely wasn't a $750,000 diamond." (*See* Doc. 55-9 at 40–41.) Although Pate acknowledges that this August 2011 conversation was the first time that he believed Toto had lied to him, he disputes that he knew at that time what Toto had misrepresented and the extent of those misrepresentations.

On June 20, 2013, Pate first filed suit against Toto. The parties litigated their first suit until July 1, 2015 when they mediated their dispute. Attorney Bruce Rogers ("Rogers") served as the mediator. Following the mediation, the parties entered into a settlement agreement, which provided that Pate would give Toto until January 31, 2016 to market and sell the red diamond. Toto would then pay most of the settlement amount from the proceeds of that sale. The settlement agreement also included a tolling provision, which tolled the statute of limitations on Pate's claims during the pendency of his first lawsuit and up to March 1, 2016. Because Toto agreed that the action could be dismissed without prejudice, the settlement agreement also included a provision that Pate had the right to refile his lawsuit if the diamond was not sold by January 31, 2016.

As part of the settlement agreement, the parties agreed that the red diamond would be transported to California by the armored transportation company Brink's,

which would hold the diamond for Pate while Toto showed it in California. However, Brink's never signed off on the proposed terms of the settlement agreement. Ultimately, Brink's never agreed to the settlement agreement's terms and Pate began working to find an alternate delivery arrangement. According to Pate, these efforts were done in conjunction with Toto and Rogers. However, Toto disputes that he was heavily involved in these discussions. In March 2016, Rogers reached out to Toto who provided Rogers with an alternate delivery arrangement that he would be comfortable with. Toto stated that fixing the delivery arrangement issues would help with his efforts to market the red diamond. Rogers then relayed this information to Pate's attorney Jim Ward ("Ward") in an April 4, 2016 email. However, apparently due to computer problems, Ward did not receive this email until May 11, 2016. After Ward received Rogers's email, he and Pate requested a May 18, 2016 conference call between Rogers, the parties, and the attorneys. Ultimately, it appears that that conference call never occurred, and the parties did not discuss any alternate delivery arrangement after May 2016. Pate then refiled this lawsuit on July 15, 2016.

## II.    STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[3] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the

---

[3] A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F. 3d 1039, 1049 (11th Cir. 2015).

nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## II. DISCUSSION

### A. PATE'S MOTION FOR DEFAULT JUDGMENT

As an initial matter, the Court will address Pate's Motion for Default Judgment, which argues that a default judgment or "all sanctions which the Court deems appropriate" should be entered against Defendants due to discovery abuses. (Doc. 46.) Defendants respond that no default judgment should be entered against them because they did not violate any discovery order entered by this Court and made a good faith effort to respond to Pate's request for the documents that were the subject of his motion.

Pate argues that the Court should enter default judgment as a sanction for Defendants' failure to produce documents regarding communications between NBS Diamonds ("NBS") and Defendants. Pate states that Defendants did this in a deliberate attempt to hide their relationship with NBS and its employee Bruno Scarselli. As evidence of Defendants' failure to produce responsive documents, Pate attached to his motion NBS's production of over one hundred and ninety-nine pages of communications between NBS and Defendants. (*See* Docs. 46-3 to 46-6.) Pate argues that the existence of these documents demonstrates that Defendants did not comply with their discovery obligations. Additionally, Pate argues that due to Defendants' failure to produce these communications he has been unable to prepare for depositions and trial.

Defendants respond by stating that they have not engaged in any discovery abuse. Defendants argue that they have produced communications with NBS that are relevant to Pate's claims and objected to production of other communications with NBS on relevancy grounds. Defendants state that most of the documents that are the subject of Pate's motion were copies of Pate's own expert report, communications between Toto and NBS related to Pate's subpoena of NBS, and emails regarding gems other than Pate's red diamond. Defendants further state that the documents that do concern the red diamond are documents related to efforts to sell the red diamond after the settlement of Pate's first lawsuit, which the parties

agreed would not be discoverable. Finally, Defendants argue that they did make good faith attempts to produce responsive documents to Pate and that they were attempting to comply with Pate's requests at the time he filed this motion.

Under Federal Rule of Civil Procedure 37(b)(2), a default judgment may be entered against a party as a discovery sanction. *See* Fed. R. Civ. P. 37(b)(2)(A)(vi). Discovery sanctions may be issued when "a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). This includes orders under Rules 26(f), 35, or 37(a). *Id.* Additionally, Rule 37(d) allows for the sanction of default judgment if a party "fails to serve its answers, objections, or written response" to interrogatories or a request for inspection. Fed. R. Civ. P. 37(d)(1)(A)(ii).

"[A]lthough Rule 37 confers upon district court judges broad discretion to fashion appropriate sanctions for the violation of discovery orders, this discretion is not unbridled." *United States v. Certain Real Property Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317 (11th Cir. 1997) (citations omitted). Accordingly, Rule 37 sanctions, such as entry of default judgment, are only appropriate "where the party's conduct amounts to flagrant disregard and willful disobedience *of discovery orders*." *Id.* (quoting *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987)) (emphasis in original).

Although Pate asks the Court to enter a default judgment pursuant to the Federal Rules of Civil Procedure, Pate does not point the Court to a provision of the Federal Rules that would allow such default judgment to be entered. Before filing his motion for default judgment, Pate did not file a motion to compel as contemplated by Rule 37(a). Accordingly, the Court did not enter a discovery order under that Rule. Moreover, Pate has failed to demonstrate that Defendants acted in violation of Rule 37(d). There is no dispute that Defendants did respond to Pate's requests for production and interrogatories. Although Pate now asserts that Defendants' responses were insufficient, he did not challenge them at the time they were made. By failing to do so, he deprived the Court of an opportunity to direct Defendants to produce the requested documents. Because violation of a discovery order is a prerequisite to sanctions, the Court cannot enter a default judgment against Defendants under Rule 37.

In addition to Rule 37, courts have the inherent power to enter a default judgment as a sanction for litigation misconduct. *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009). The court's inherent power derives from the court's need to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quotation marks and citation omitted)). This power, however, "must be exercised with restraint and discretion." *Id.* (citing

*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 754 (1980)). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45. Dismissal of a lawsuit, or entry of a default judgment, is a "particularly severe sanction." *Id.* at 45. "The key to unlocking a court's inherent power is a finding of bad faith." *Eagle Hosp.*, 561 F.3d at 1306 (quoting *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)). A party can act in bad faith in this context by delaying or disrupting litigation or hampering enforcement of a court order. *Barnes*, 158 F.3d at 1214.

Here, the Court does not find that Defendants' failure to produce communications with NBS was in bad faith. As stated above, Defendants did not engage in willful violations of any order issued by this Court. At most, Defendants failed to produce certain documents that were responsive to Pate's requests for production and interrogatories. Even assuming that Pate is correct in stating that Defendants intentionally withheld these documents, Defendants appear to have done so due to their belief that the documents were either irrelevant or non-discoverable. Moreover, Defendants have certified to the Court that they were actively looking for these documents when Pate filed his motion. Although Defendants' belief that they did not have to turn over these documents may have been misguided, it does not warrant imposition of default judgment or other

monetary sanctions against Defendants. Therefore, Pate's Motion for Default Judgment is due to be denied.

## B. STATUTE OF LIMITATIONS ON BREACH OF CONTRACT CLAIMS

In their summary judgment motion, Defendants first argue that Pate's breach of contract claims are time-barred. The statute of limitations for breach of contract in Alabama is six years. Ala. Code § 6-2-34(9). Typically, the statute of limitations runs from the date of the alleged breach. *AC, Inc. v. Baker*, 622 So. 2d 331, 335 (Ala. 1993). However, Alabama Code § 6-2-3 equitably tolls the statute of limitations when a defendant fraudulently conceals the existence of a breach of contract claim against him. *See Dodd v. Consol. Forest Prod., LLC*, 192 So. 3d 409, 412 (Ala. Civ. App. 2015) (citing *DGB, LLC v. Hinds*, 55 So. 3d 218, 224–26 (Ala. 2010)). In Alabama, "when the plaintiff alleges fraudulent concealment . . . the statute of limitations is tolled until the plaintiff actually discovers the [injury], or could have discovered the [injury] through the exercise of due diligence." *Sellers v. A.H. Robins Co., Inc.*, 715 F.2d 1559, 1561 n.** (11th Cir. 1983).

Pate first filed suit against Toto on June 20, 2013. Thus, Pate's breach of contract claims are time barred if the statute of limitations began to accrue on Pate's claims more than six years before that date. Pate does not dispute that he formed the agreement that constitutes the basis of his breach of contract claims on September 6, 2006 or that he paid for the red diamond in October 2006. Thus,

under the general rule for breach of contract claims, Pate's claims would have expired no later than October 2012, or eight months before he first filed suit. However, Pate claims that he is entitled to the savings clause of § 6-2-3 because Toto concealed both the actual value of the red diamond and his profit from the sale of the diamond for several years.

Preliminarily, for § 6-2-3 to toll Pate's breach of contract claims, he must have been unaware of facts that would have put him on notice of those claims. If fraudulent concealing tolling applies, "the limitations period commences once the fraud is readily discoverable or the potential plaintiff is on notice that a fraud may have been perpetrated." *Lampliter Dinner Theater, Inc. v. Liberty Mut. Ins. Co.*, 792 F.2d 1036, 1043 (11th Cir. 1986) (citing *Johnson v. Shenandoah Life Ins. Co.*, 281 So. 2d 636, 642–43 (Ala. 1973)). "Facts that would provoke a reasonable person's inquiry and lead to a discovery of the fraud commence the limitations period." *Id.* (citing *Butler v. Guar. Sav. & Loan Ass'n*, 37 So.2d 638 (Ala. 1948)). In general, "the question of when a party discovered or should have discovered fraud which would toll the statute of limitations is for the jury." *Vandegrift v. Lagrone*, 477 So. 2d 292, 295 (Ala. 1985).

However, in *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 421 (Ala. 1997), the Alabama Supreme Court returned to an objective standard for evaluating fraud claims and imposed a "general duty on the part of a person to read the documents

received in connection with a particular transaction." Thus, under *Foremost*, if a plaintiff receives a document that would put a reasonably prudent person on notice of his claims, a court may determine as a matter of law that the limitations period began running as of the date he received the document. *See, e.g.*, *Auto-Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001).

Toto argues that the November 2006 appraisal form put Pate on notice of his potential breach of contract claims. The appraisal form included in fine print that the appraisal "reflect[s] the costs incurred to replace or reproduce any gems in like quality" and that this "do[es] not necessarily reflect the price at which the appraised item may be purchased from any one jewelry store in particular." (Doc. 55-9 at 24.) The appraisal form also provided that Moboco was not guaranteeing the value of the diamond. (*Id.*) Pate does not dispute the contents of the appraisal form, but rather, presents evidence that Toto made representations that the appraisal's estimate of value would reflect "what the diamond is worth." (Doc. 58 at 6.) Pate argues that it was reasonable for him to rely on Toto's representations rather than the representations contained within the fine print of the appraisal form, which he had difficulty reading.

The Court is not convinced that the disclaimer refusing to guarantee the accuracy of the appraisal was sufficient to put Pate on notice of his breach of contract claims. Rather than directly contradict Toto's representation that the red

diamond was worth at least $2,100,000, the disclaimer merely provides that other appraisers might value the red diamond differently. A disclaimer that "estimates of value and quality may vary from one appraiser to another" does not necessarily notify Pate that the red diamond was worth less than $2,100,000. Pate might reasonably assume that a different appraiser would value the red diamond as worth more than $2,100,000. Thus, because the disclaimer did not clearly contradict Toto's alleged representation, it was not sufficient to commence the running of the statute of limitations.

The Court is equally unpersuaded that the provisions that the appraisal "reflect[s] the costs incurred to replace or reproduce any gems in like quality" and that these costs "do not necessarily reflect the price at which the appraised item may be purchased from any one jewelry store in particular" were sufficient to put Pate on notice of his potential breach of contract claims. These provisions are contradicted by other provisions within the appraisal form which state that "[s]uch costs or values are estimates of the averaged current market price at which the appraised item may be purchased" and that the "estimate of value" of the red diamond was $2,100,000 (Doc. 55-9 at 24.) Due to these contradictions, a reasonably prudent person may have looked at the form as a whole and determined that it supported rather than contradicted Toto's representation that the appraisal would reflect what the red diamond was actually worth. *See Potter v. First Real*

*Estate Co.*, 844 So. 2d 540, 551 (Ala. 2002) (distinguishing *Foremost* from cases where the plaintiff is provided inconsistent documents).

Moreover, the provisions relied upon by Defendants were not as conspicuous as other written statements found to trigger the statute of limitations. For example, the *Foremost* court noted that if the plaintiffs had "read or even briefly skimmed" the documents presented to them that they would have had notice of their fraud claims. *Foremost*, 693 So. 2d at 422. Although the Court is unconvinced that this fact alone renders the appraisal form's provisions invalid, it does support Pate's assertion that a reasonable person would not have discovered his breach of contract claims based on the contents of the appraisal form. Accordingly, the Court does not find that the appraisal form was sufficient, as a matter of law, to put Pate on notice of his breach of contract claims.

Additionally, to defeat Defendants' summary judgment motion and successfully invoke the savings clause of § 6-2-3, Pate must establish "prima facie facts which show that [Defendants] fraudulently prevented discovery of the wrongful act on which the action is based." *Sellers*, 715 F.2d at 1561 (citing *Hudson v. Moore*, 194 So. 147 (Ala. 1940), *superseded by statute on other grounds*, *as stated in Jett v. Wooten*, 110 So. 3d 850, 854 (Ala. 2012)). Thus, Pate bears the burden to present prima facie evidence regarding: (1) "the time and circumstances of the discovery of the cause of action," (2) "the facts or

circumstances by which the defendants concealed the cause of action or injury," and (3) "what prevented [him] from discovering the facts surrounding the injury." *See DGB*, 55 So. 3d at 226 (stating that a plaintiff invoking § 6-2-3 must allege these facts to survive a motion to dismiss).

Here, Pate has sufficiently provided evidence regarding the time and circumstances of his discovery of his breach of contract claims. Pate testified that he first began to believe Toto was lying to him during their August 2011 telephone conversation. (*See* Doc. 55-7 at 58–59.) Although Defendants contend that Pate was put on notice of his breach of contract claims prior to this, they do not dispute Pate's claim that this was the first time Pate actually discovered that Toto had made any misrepresentations about their transaction. (*See* Doc. 55 at 17.) Therefore, Pate has presented sufficient evidence that, at the very earliest, he obtained actual knowledge of his breach of contract claims in August 2011.

Moreover, Pate has presented sufficient evidence regarding the facts or circumstances by which Defendants concealed his breach of contract claims. It is undisputed that Toto paid $800,000 for the red diamond. However, for years, he represented to Pate that the diamond was worth far more than that. For example, in 2008, he marketed the diamond as worth $3,500,000 at the Moscow Fair (doc. 55-9 at 29), and in 2009, had the diamond mentioned in *Famous Diamonds* where its current value is now listed as $6 million (doc. 58-7 at 10). Accordingly, Pate has

presented prima facie evidence that Toto concealed the actual value of the red diamond from him for several years.

Furthermore, it is undisputed that during the August 2011 telephone conversation Toto stated that he made $155,000 on the sale of the red diamond (doc. 55-7 at 91), which is much less than the $1.3 million markup Toto placed on the red diamond's wholesale price. Even though Toto argues that this number reflects his profits after factoring in overhead expenses, this statement provides evidence that Toto had been concealing from Pate the profits he received from the sale of the red diamond. As such, Pate has presented prima facie evidence that Toto prevented him from discovering his breach of contract claims through continued misrepresentations.

Finally, Pate has presented evidence that Toto's continued representations regarding the value of the red diamond prevented him from discovering his breach of contract claims. Toto repeatedly reassured Pate about the value of the red diamond. Moreover, Pate has asserted that he trusted Toto's statements regarding the red diamond because he believed Toto to be an expert in diamonds. (*See* Doc. 58-2 at 3.) Pate's reliance on Toto's expertise does not appear to have been misplaced. Toto testified that he had many years of experience in appraising jewelry and learned how to evaluate gemstones by taking courses with the Gemological Institute of America. (*See* Doc. 58-4 at 21.) Thus, it was reasonable

for Pate to rely on Toto's representations regarding the value of the red diamond and those representations are what prevented Pate from discovering his breach of contract claims in 2006.

In sum, the Court finds that Pate has presented prima facie evidence that Toto fraudulently concealed his breach of the contract. Thus, Pate is entitled to the savings clause of § 6-2-3. Moreover, the provisions of the appraisal form are insufficient for the Court to conclude, as a matter of law, that Pate was put on notice of his breach of contract claims in November 2006.

### C. INDEFINITENESS OR SPECULATIVE NATURE OF BREACH OF CONTRACT CLAIMS

Defendants next argue that Pate's breach of contract claims fail as a matter of law because the alleged agreement between Pate and Toto was too speculative and indefinite. Whether or not an agreement fails for indefiniteness is a question of law. *See White Sands Group, L.L.C. v. PRSII, LLC*, 998 So. 2d 1042, 1052 (Ala. 2008). For an agreement to be an enforceable contract, all of its essential terms "must be sufficiently definite and certain." *Id.* at 1051 (quoting *Miller v. Rose*, 532 S.E.2d 228, 232 (N.C. App. 2000)). When a contract leaves material portions, such as the time for performance or the price to be paid, open for future agreement, it is void for indefiniteness. *Id.* However, "[t]he terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* at 1042 (quotation marks and emphasis

omitted). "[I]n order for an alleged contract to be considered void based on the indefiniteness of its terms, the indefiniteness must reach the point where construction becomes futile." *Poole v. Prince*, 61 So. 3d 258, 275 (Ala. 2010). Courts should attach a definite meaning to the terms of an agreement if it appears that the parties intended to enter into a binding contract. *Id.*

The parties disagree as to whether the terms of the alleged agreement to find Pate a buyer in three to five years who would pay Pate double his purchase price were sufficiently defined. Defendants argue that the agreement was indefinite because the parties left open for future agreement the time of performance, the sales price, what would happen if Toto could not find a suitable buyer, and other terms of the transaction.

However, the Court finds that there is sufficient evidence that the agreement between Pate and Toto constituted a valid contract. In his deposition testimony, Pate stated that the agreement included a clearly defined commission of $100,000 and that it obligated Toto to find a buyer for the diamond. Moreover, Pate testified that the agreement included a detailed breakdown of profits that the parties would receive from the transaction. According to Pate, the parties agreed that Pate would be entitled to the first $1 million in profit for sale of the diamond. The remainder would then be distributed with Pate receiving 75% of that sum and Toto receiving 25%. Thus, viewing the evidence in the light most favorable to Pate, not only did

the agreement obligate Toto to sell the diamond but it also provided for the profits each party would receive once that sale occurred. This evidence suggests that the contract did include essential terms that were sufficiently defined.

As for Defendants' argument that both the time of performance and sales price were left open, Pate has presented evidence that they were not. Although at one point Pate testified that the parties agreed that they would "consult together and decide when to sell" the diamond (doc. 58-2 at 5), he consistently testified that the agreement was that the diamond would be sold in at least three to five years. Even when Pate stated that the agreement left open the possibility that the diamond would be sold outside the three to five year timeframe, his testimony was that the substance of the agreement was that Toto would sell the diamond within the next three to five years (*See id.* at 5, 7.) Further, Pate has presented sufficient evidence that the agreement defined the diamond's sales price. According to Pate, Toto promised him that the diamond would be able to be sold for double Pate's purchase price. Moreover, Pate testified that, as he understood the agreement, Toto would sell the diamond for at least $4 million. (*See* Doc. 58-1 at 44.) Thus, Pate has presented evidence that both the sales price and the time for performance were sufficiently defined so as to not render the contract void for indefiniteness.

Furthermore, the fact that Pate and Toto reached a separate agreement regarding Toto's marketing of the diamond at the 2008 Moscow fair does not

necessarily mean that their initial agreement was too indefinite. It simply shows that they entered into another agreement. When Toto approached Pate about marketing the diamond at the Moscow Fair, they made specific arrangements for that particular sales opportunity, which included detailing how the diamond would be transported to Russia and how it would be insured during the trip. They also agreed that Toto would offer the diamond for sale for $3.5 million. Although Defendants argue this shows that an initial sales price had not been agreed to in 2006, the fact that this is a different price than the initially agreed to $4 million does not render that initial agreement indefinite. Pate testified that he agreed to allow Toto to sell the diamond for $3.5 million because he thought that the Moscow Fair presented a good opportunity for him to sell the diamond and that he had come to the conclusion that he needed to monetize his investment. (Doc. 58-2 at 18–19.) This is akin to a home owner and real estate agent reducing the listing price of a home to reflect changes in the housing market. No one would say that because of the change in sales price the real estate agent and homeowner's initial contract to sell the home for a certain amount of money was void for indefiniteness. Likewise, the subsequent agreement regarding the Moscow Fair does not support a finding that the contract was void for indefiniteness.

Accordingly, viewing the evidence in the light most favorable to Pate, the essential terms of Pate and Toto's September 2006 agreement were sufficiently

defined. Therefore, at this summary judgment stage, the Court does not find that as a matter of law the agreement was void for indefiniteness. Thus, Defendants are not entitled to summary judgment with respect to Pate's breach of contract claims.

### D. STATUTE OF LIMITATIONS ON FRAUDULENT MISREPRESENTATION CLAIMS

Defendants next argue that Pate's fraudulent misrepresentations claims are time barred. The statute of limitations for fraud in Alabama is two years. Ala. Code § 6-2-38(l). The two-year limitation period begins to run when a plaintiff is privy to facts which would "provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud." *Abston*, 822 So. 2d at 1195 (quoting *Willcutt v. Union Oil Co.*, 432 So. 2d 1217, 1219 (Ala. 1983)). "[T]he question of when a party discovered or should have discovered the fraud is generally one for the jury." *Gilmore v. M&B Realty Co., L.L.C.*, 895 So. 2d 200, 210 (Ala. 2004) (quoting *Liberty Nat'l Life Ins. Co. v. Parker*, 703 So. 2d 307, 308 (Ala. 1997)). However, the question of when a plaintiff discovered or should have discovered fraud may be decided as a matter of law in cases where "the plaintiff actually knew of facts that would have put a reasonable person on notice of the fraud." *Ex parte Alabama Farmers Co-op, Inc.*, 911 So. 2d 696, 703 (Ala. 2004) (quoting *Barlow v. Liberty Nat'l Life Ins. Co.*, 708 So. 2d 168, 173, 174 (Ala. Civ. App. 1997)).

### 1. Pate Did Not Have Notice of Fraud in November 2006

Defendants first argue that Pate had notice of his fraudulent misrepresentation claims when he received the November 2006 appraisal form. However, for the same reasons that the appraisal form did not put Pate on notice of his breach of contract claims, it was insufficient to put him on notice of his fraudulent misrepresentation claims. Due to the inconsistencies within the appraisal form and the fact that its provisions did not clearly contradict Toto's alleged representations, a jury could find that a reasonably prudent person would not have discovered Pate's fraud claims in November 2006. Therefore, the Court does not find that, as a matter of law, Pate had notice of his fraudulent misrepresentation claims in November 2006.

2.     Statute of Limitations Did Not Begin to Run in January 2011

Defendants next argue that Pate was put on inquiry notice of his fraud claims by January 2011. In early January 2011, Pate received information that a red diamond had been offered at an auction in Hong Kong in 2005 for $700,000. Pate then sent Toto an email asking whether the two diamonds were the same. (*See* Doc. 55-9 at 38.) In the email, Pate asked Toto what he knew about the Hong Kong auction and expressed his belief that the story provided "interesting history" about his diamond. (*Id.*) When Toto replied that he had never heard that story before, Pate responded that it was "[not] a story . . . but a fact!" (*Id.*)

Pate asserts that there is a dispute of fact as to whether he should have discovered Toto's fraud in January 2011. First, Pate argues that the information provided in the story about the Hong Kong auction was insufficient to put him on inquiry notice because he had no idea as to whether the information was true. Pate also argues that the statute of limitations did not begin to run in January 2011 because of Toto's continued misrepresentations regarding the red diamond. The limitations period remains tolled if "after discovery of the fraudulent act and inquiry, the plaintiff is misinformed or falsely informed by the defendant and the plaintiff reasonably relies on the defendant's misrepresentations." *Ex parte Ala. Farmers Co-op., Inc.*, 911 So. 2d at 703.

As evidence that he reasonably relied on further misrepresentations made by Toto, Pate points to his deposition testimony that Toto called him sometime after the January email exchange and stated that the diamond sold at the Hong Kong auction was a different diamond than the one sold to Pate. (*See* Doc. 58-2 at 45.) Pate stated that Toto convinced him that the two diamonds were different and that he believed Toto because he trusted him as his investment advisor. (*Id.*) Moreover, Pate testified that Toto referred him to another stone that Toto said he believed was the stone auctioned in Hong Kong. *(Id.)* Defendants argue that this deposition testimony should be discounted because Pate's earlier deposition testimony was

that he and Toto did not have any additional conversations about the red diamond until August 2011.

Due to the fact that Pate actually did inquire into the validity of the story about the Hong Kong auction, the Court agrees with Defendants that knowledge of the Hong Kong auction would cause a reasonable person to inquire. However, the test for whether someone has been put on inquiry notice does not end there. Instead, the requirement is that the inquiry "if followed up, would have led to discovery of the fraud." *See Abston*, 822 So. 2d at 1195. Here, there is no evidence that any further inquiry by Pate would have led to discovery of Toto's alleged fraud. When Pate asked Toto about the Hong Kong auction, he replied "I have never heard that story. Where did you get this from?" (Doc. 55-9 at 38.) Moreover, according to Pate, Toto made later representations to him that the diamond sold in Hong Kong was a different diamond than the one sold to Pate. As Toto was the person that sold Pate the diamond, it was reasonable for Pate to conclude that Toto would be his best source of information on the diamond's history. However, Pate has presented evidence that Toto's continued misrepresentations prevented him from discovering the diamond's true history.

Further, there is no evidence that the story on the Hong Kong auction included any information regarding identifying marks that would have let Pate know that the two diamonds were the same. In fact, even when Pate contacted

Bruning, the Sotheby's diamond expert, in August 2011, Bruning only told him that he was "pretty positive" that Pate's diamond was the same as the one sold in Hong Kong. (*See* Doc. 58-3 at 1.) Therefore, it cannot be said that any inquiry by Pate following his receipt of the Hong Kong story would have led to discovery of the fraud. Thus, the Court cannot find as a matter of law that Pate was on inquiry notice of his fraud claims in January 2011.

3.     Pate Had Notice of Fraud Claims in August 2011

Defendants next argue that Pate's fraud claims are time-barred because he had actual knowledge of Toto's alleged misrepresentations by August 3, 2011. In response, Pate argues that he did not know of his potential fraud claims in August 2011 due to Toto's continued misrepresentations. As evidence that he was not on notice of his fraud claims in August 2011, Pate cites to Toto's attempted reassurances during the August 2011 conversation that the diamond was worth more than $750,000 and that Pate could trust him. He also points to subsequent emails sent by Toto where Toto told Pate that the diamond at the Hong Kong auction was different than the diamond sold to Pate and that he was continuing to market the red diamond. (*See* Doc. 58-10 at 30.)

However, Pate's argument that he did not have knowledge of Toto's alleged fraudulent misrepresentations in August 2011 is not supported by the evidence on the record. Although Pate may not have known the extent of Toto's alleged fraud

until discovery in the first lawsuit, it is not necessary that a plaintiff have actual knowledge of all alleged misrepresentations before the statute of limitations begins to accrue. *See, e.g., Ex parte Ala. Farmers Co-op.*, Inc., 911 So. 2d at 702; *Abston*, 822 So. 2d at 1195. Instead, the test is whether Pate had actual knowledge of facts that would put a reasonable person on notice of the fraud. *See Abston*, 822 So. 2d at 1195.

Here, Pate admits that he began to believe that Toto lied to him in August 2011. During his August 2011 conversation with Toto, he got Toto to acknowledge that he made more than $100,000 in profits off of the transaction. (Doc. 58-2 at 15.) Moreover, Pate testified that based on his conversations with Bruning and Toto that August 2011 was the first time that he knew for certain that Toto had been lying to him about the red diamond. (Doc. 55-7 at 58.) Pate stated that he became convinced during his conversation with Toto that Toto had misrepresented what he paid for the diamond and its actual value. (*See* Doc. 58-2 at 15.) Pate further testified the only reason he continued to allow Toto to market the red diamond after August 2011 was that he hoped Toto could sell the diamond and get his money back. (*See* Doc. 58-2 at 14.) In both his complaint and deposition testimony, Pate cites August 2011 as the date where he learned the diamond's value was less than what Toto represented. (*See* Compl. ¶ 18; Doc. 58-2 at 14–15.) He cites no evidence that he continued to rely on Toto's reassurances after August

2011. Further, due to the fact that by August 2011 Pate knew that Toto had misled him on the amount of money he made off of the transaction and the diamond's actual value, it would have been unreasonable for him to rely on any additional representations by Toto regarding the profitability of the red diamond.

Accordingly, the Court finds that as a matter of law the limitations period for Pate's fraud claims began to accrue by no later than August 3, 2011. Because Pate's initial suit was filed on June 20, 2013, it was properly filed within the limitations period. As provided for by the settlement agreement, the limitations period was tolled during the pendency of the first lawsuit and through March 1, 2016. Once the tolling period ended the statute of limitations began to run again and, unless subject to additional tolling, would have expired on April 14, 2016, or three months before this lawsuit was refiled.

4.    Equitable Estoppel[4]

Pate first argues that Toto should be equitably estopped from asserting a statute of limitations defense for Pate's failure to refile this lawsuit in a timely manner. Pate bases his equitable estoppel argument on his allegation that Toto and

---

[4] In their Motion to Strike (doc. 61), Defendants argue that Pate's equitable estoppel defense should be struck because he failed to disclose this defense in response to interrogatories. However, the Court finds that Pate's discussion of equitable estoppel in his Response in Opposition (doc. 58) was responsive to arguments made in Defendants' Second Motion for Summary Judgment (doc. 55.). While claiming to address Pate's equitable tolling defense, Defendants' brief exclusively relied on cases discussing equitable estoppel. (*See* Doc. 55 at 28–30.) Moreover, Defendants' argument related to the elements of equitable estoppel and not those of equitable tolling. Therefore, Defendants' Motion to Strike (doc. 61) is due to be denied.

his counsel assured Pate that they were attempting to find a solution to problems the parties were having following the delivery arrangement provision of the Settlement Agreement so that Pate would not have to refile this lawsuit.

When determining whether a defendant is estopped from asserting the statute of limitations as a defense, the Court must "balance the purpose of the statute of limitations with the injustice that would result from allowing the defendants to claim it as a defense." *City of Birmingham v. Cochrane Roofing & Metal Co., Inc.*, 547 So. 2d 1159, 1167 (Ala. 1989). The Supreme Court of Alabama has summarized the law applicable to determining whether a party is equitably estopped from asserting the statute of limitations as a defense in this way:

> In *Mason v. Mobile County*, 410 So. 2d 19 (Ala. 1982), this Court held that if a defendant either fraudulently or innocently represents to the plaintiff that he will remedy a problem, and relying on these representations the plaintiff is not induced to file a lawsuit or take any action, the defendant may be estopped from raising the statute of limitations as a defense. Additionally, in *Arkel Land Co. v. Cagle*, 445 So. 2d 858 (Ala. 1983), we held that if a defendant represents that a lawsuit is unnecessary because he intends to take care of the problem he is likewise estopped from raising the statute of limitations as a defense.

*Cochrane Roofing*, 547 So. 2d at 1167. The type of action which is sufficient to prevent a defendant from asserting the statute of limitations "must amount to an affirmative inducement to the claimant to delay bringing action." *Seybold v.*

*Magnolia Land Co.*, 376 So. 2d 1083, 1085 (Ala. 1979). The Court must also apply a "standard of reasonableness" to these estoppel principles, looking to see whether a reasonable person would have allowed the statute of limitations to expire based on the defendants' actions. *Cochrane Roofing*, 547 So. 2d at 1167; *see also McCormack v. AmSouth Bank, N.A.*, 759 So. 2d 538, 543 (Ala. 1999).

In *Mason v. Mobile County*, the plaintiffs failed to sue for alterations to a drainage ditch that caused the plaintiffs' home to flood because the County repeatedly assured them that the problem would be fixed. 410 So. 2d at 20. The Alabama Supreme Court found that the County was estopped from asserting a statute of limitations defense because it had represented that it would attempt to correct the drainage problem, and plaintiffs relied on those representations when deciding not to file suit during the applicable limitations period. *Id.* at 21. Similarly, in *Sirmon v. Wyndham Vacation Resorts, Inc.*, 922 F. Supp. 2d 1262, 1278 (N.D. Ala. 2013), this Court found that defendants who responded to a demand letter by falsely responding that they would restore customers' VIP benefits were not entitled to summary judgment on statute of limitation grounds. Instead, this Court concluded that a jury should be allowed to consider whether those defendants were equitably estopped from asserting a statute of limitations defense. *Id.*

In contrast, the defendants in *Moore v. Nat'l Sec. Ins. Co.*, 477 So. 2d 346 (Ala. 1985), were not equitably estopped from asserting a statute of limitations defense. In that case, the plaintiffs, who had attempted to purchase additional life insurance coverage on their existing policies, were sold brand new policies by their insurance agent. *Id.* at 347. The plaintiffs then mistakenly stopped making payments on their existing policies, which caused them to lapse. *Id.* After discovering the error, the plaintiffs contacted the insurance company whose employees told them that they were "checking into the problem." *Id.* Ultimately, the insurance company failed to fix the problem, and the plaintiffs filed a fraudulent concealment suit against the company after the statute of limitations had already run. *Id.* at 348. The Alabama Supreme Court held that the defendants could assert a statute of limitations defense because their statements to the plaintiffs were only "vague assurances and did not affirmatively induce" inaction. *Id.*

Likewise, in *Spearman v. Wyndham Vacation Resorts, Inc.*, 69 F. Supp. 3d 1273, 1290 (N.D. Ala. 2014), this Court found that a timeshare company was not equitably estopped from asserting a statute of limitations defense at the summary judgment stage due to a statement by one of its employees. In that case, the employee told a dissatisfied customer that if he brought a lawsuit she would no longer be able to help him with his timeshare account. *Id.* This Court found that this was similar to the "vague assurances" made in *Moore*. *Id.* Thus, this Court

concluded that it was unreasonable to delay filing suit based on this statement and that there was no evidence to support presenting the equitable estoppel claim to a jury. *Id.*

Here, Pate argues that the actions of Toto and his counsel were more like the affirmative inducements in *Sirmon* than the vague assurances made in *Spearman*. He points to evidence that in December 2015, once the parties had trouble getting Brink's to transport the red diamond to California, Toto's counsel represented that Toto was "willing to entertain any alternate arrangement" that Pate suggested. (Doc. 64-13 at 120.) Pate further argues that he delayed refiling this lawsuit due to conversations with Rogers who reassured him that Toto was trying to help resolve the delivery arrangement issues. He points to the April 4, 2016 email from Rogers to Ward where Rogers relayed that Toto would agree to changes in the delivery arrangement provided in the Settlement Agreement. In that email, Rogers presented specific proposals made by Toto for an alternative arrangement to the delivery method agreed to in the Settlement Agreement. (*See* Doc. 64-13 at 19.) As Pate points out, according to Rogers, Toto told him that resolving the delivery issues would help with Toto's efforts to market and sell the red diamond. (*Id.*)

Toto's actions do not rise to the level of the affirmative inducements in *Mason* or *Sirmon*. Although Toto indicated that he was willing to use an alternate delivery arrangement, he never agreed to extend the tolling period or guaranteed

that resolving the delivery issues would lead to the sale of the red diamond. At most, he stated that having the diamonds with him would help with his sales efforts. These facts distinguish this case from those in *Sirmon* and *Mason* where there were repeated promises that all of the problems giving rise to a potential lawsuit would be resolved. For example, in *Sirmon*, Wyndham's sales representatives repeatedly assured the plaintiffs that the changes to their accounts would be fixed and that the company was working to restore the plaintiffs' VIP benefits. *See Sirmon*, 922 F. Supp. 2d at 1276–77. Instead, Toto's actions are more like the actions taken by the employees in *Moore*. There, the court found that because the employees "never assured the [plaintiffs] that they would receive all they believed they were entitled to receive" that the defendant was not equitably estopped from asserting a statute of limitations defense. *See Moore*, 477 So. 2d at 348. Similarly, Pate had no reason to believe that fixing the delivery arrangement issues would obviate his need to refile this lawsuit. Toto had been unsuccessfully trying to sell the red diamond for years and had not been able to sell it by the January 31, 2016 deadline imposed by the Settlement Agreement. Even though Toto may have been better able to market the diamond with it in his possession, it was far from guaranteed that the diamond would have been sold and that Pate would have received the money provided for by the Settlement Agreement.

Further, in evaluating Pate's estoppel argument, the Court must apply a "standard of reasonableness." *Cochrane Roofing*, 547 So. 2d at 1167. Here, it was unreasonable for Pate to conclude that Toto's assurances that the parties could depart from the Settlement Agreement's delivery arrangement meant that he did not have to abide by the tolling period provision. This is not a case where the parties ever entered into an agreement to extend the tolling period. *See Milliard Refrigerated Servs., Inc. v. Darville*, Civil Action 15-0245-WS-N, 2016 WL 8232237, at *8 (S.D. Ala. Jan. 29, 2016) (finding equitable estoppel defense to present jury question where parties had extended tolling period several times in the past). Instead, there is no evidence that Pate ever asked Rogers or Toto about the effect these late negotiations would have on the tolling period. Given the fact that the Settlement Agreement provided that the statute of limitations on Pate's claims would only be tolled until March 1, 2016, it was unreasonable for Pate to wait until July to refile the lawsuit without first receiving assurances that the tolling period would be extended. Thus, Defendants are not equitably estopped from asserting a statute of limitations defense.

5.    Equitable Tolling

Pate also argues that equitable tolling should extend the statute of limitations on his fraud claims. "[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and

(2) that some extraordinary circumstance stood in his way" as to the filing of his action. *Weaver v. Firestone*, 155 So. 3d 952, 957 (Ala. 2013) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). In other words, equitable tolling is only "available in extraordinary circumstances that are beyond the petitioner's control and that are unavoidable even with the exercise of diligence." *Ex parte Ward*, 46 So. 3d 888, 897 (Ala. 2007). When determining whether equitable tolling applies, courts should consider "whether principles of equity would make the rigid application of a limitation period unfair and whether [the plaintiff] has exercised reasonable diligence in investigating and bringing [the] claims." *Weaver*, 155 So. 3d at 958 (quoting *Ex parte Ward*, 46 So. 3d at 897) (internal quotation marks omitted).

Here, the extraordinary circumstances required to trigger equitable tolling are not present. Although the parties were unable to abide by the delivery terms originally provided for in the Settlement Agreement, Pate admits that he knew of these issues by December 2015. However, there is no evidence that Pate ever asked Toto or Rogers to extend the tolling period. Moreover, the mere fact that the parties continued to work to sell the diamond after January 31, 2016 does not excuse Pate's failure to refile this lawsuit in a timely manner. For equitable tolling to apply, the inequitable circumstances present "must be truly beyond the control of the plaintiff." *See Weaver*, 155 So. 3d at 959 (quoting 51 Am. Jur. 2d *Limitation*

*of Actions* § 153 (2011)). In this case, Pate knew that the Settlement Agreement provided that he could refile his lawsuit if the diamonds had not been sold by January 31, 2016 and that the tolling period would only remain in effect until March 1, 2016. Despite this, he continued to attempt to carry out the Settlement Agreement without ever questioning whether the tolling provision remained in effect.

This is not the typical circumstance that triggers equitable tolling. *See id.* at 958–60 (describing circumstances where equitable tolling has been allowed to include situations where a plaintiff mistakenly filed a defective pleading during the statutory period, where the opposing party tricked the plaintiff into allowing the filing deadline to pass, and where the plaintiff could not know the defendant's identity until after the statute of limitations had run). Toto did not trick Pate into believing that the tolling period would be extended or that he would not raise a statute of limitations defense in a subsequent lawsuit. Nor did Pate ever seek clarifications regarding the applicability of the tolling period. It was within Pate's control to ask these questions and make sure that he understood the effect of the tolling period provision. Thus, this case does not present an extraordinary circumstance that implicates the doctrine of equitable tolling.

In sum, the statute of limitations on Pate's fraud claims expired no later than April 14, 2016, which was almost three months before Pate refiled this lawsuit.

Moreover, a reasonable jury could not find that Pate is entitled to assert an equitable estoppel or equitable tolling defense to his failure to timely refile this lawsuit. Therefore, Defendants' motion for summary judgment on Pate's fraud claims are due to be granted, and the Court will not proceed to consider the merits of those claims.

## III.     CONCLUSION

As stated more fully above, Pate's Motion for Default Judgment (doc. 46) is due to be denied; Defendants' Second Motion for Summary Judgment (docs. 55 & 67) is due to be granted in part and denied in part; and Defendants' Motion to Strike is due to be denied (doc. 61). An order consistent with this Memorandum of Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on October 12, 2018.

L. Scott Coogler
United States District Judge

194800